UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | |
|---|---|
| PRINCESSE D'ISENBOURG ET CIE LTD., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| V. | )<br>) |
| KINDER CAVIAR, INC., | )<br>) Civil Action No. 3: 09-29-DCR |
| Defendant. | )<br>) |
| and | )<br>) |
| KINDER CAVIAR, INC., | )<br>) **MEMORANDUM OPINION** |
| Third-Party Plaintiff, | ) **AND ORDER**<br>) |
| V. | )<br>) |
| UNITED AIRLINES, INC., | )<br>) |
| Third-Party Defendant. | ) |

\*\*\*\*   \*\*\*\*  \*\*\*\*  \*\*\*\*

This matter is pending for consideration of the Motion for Summary Judgment filed by Plaintiff Princesse D'Isenbourg Et Cie Ltd. ("Isenbourg"). [Record No. 39] Having reviewed the submissions by both parties, the motion will be granted, in part, and denied, in part.

**I.    Background**

The facts in this case are generally undisputed. Defendant Kinder Caviar, Inc. is a producer and exporter of caviar located in Owenton, Kentucky. Isenbourg is a purveyor of fine

-1-

wines and gourmet foods located in London, England. In the Fall of 2008, Isenbourg and Kinder negotiated a transaction whereby Isenbourg would purchase a large amount of caviar to be imported into the United Kingdom (the "Caviar Purchase Agreement"). On October 20, 2008, the deal was memorialized by a one-page invoice (the "Invoice").

The Invoice contained the essential terms of the transaction.[1] Isenbourg was to purchase 550.80 pounds of paddlefish caviar at a price of $235.00 per pound. The total sale amount was $129,438.00. The "Terms" provided were: "wire transfer upon receipt of invoice." Importantly for the case at hand, the Invoice stated that the caviar would be shipped to Isenbourg's place of business and provided the address: "2 Bard Road, London, W10 6TP." Upon receipt of the Invoice, Isenbourg paid Kinder the full purchase price *via* wire transfer.

Kinder received the payment on November 3, 2008 and began preparations to ship the caviar to the United Kingdom. The exportation of paddlefish caviar is subject to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). Under CITES, caviar may be traded internationally, but it must meet certain requirements and certifications. To meet one of these requirements, Kinder had to apply for an export permit from the United States Fish and Wildlife Service. CITES also requires import permits and specific labels from the importing country. Kinder asserts that, while it was obtaining the required export

---

1 The parties submitted two different versions of the Invoice, [*See* Record No. 53, ex. 1; Record No. 1, ex. 2] but there is no dispute as to the essential terms of the agreement. The differences are limited to distinct type-fonts and a disclaimer on Kinder's version that does not appear on the document submitted by Isenbourg. Neither of these distinctions bear on the analysis at hand, so any resulting factual dispute is immaterial.

permits, Isenbourg acquired the necessary CITES import documents from the UK. [Record No. 53, p. 2]

In addition to CITES requirements, food products imported into the UK are also subject to European Union food health and safety regulations. *See* Commission Regulation 853/2004, art. 5, 2004 O.J. (L139) 55 (EC). One of the EU regulations requires a shipment to be accompanied by a document known as an "EU Health Certificate" which is issued by the United States government. In this case, the certificate was issued by the United States Food and Drug Administration (the "FDA"). For the shipment in question, the FDA issued a two-page health certificate on two separate pieces of paper.

During the period prior to shipment, Tony Leung of Isenbourg and Joyce Kinder of Kinder Caviar communicated concerning the shipment requirements. On October 27, 2008, Leung sent Joyce Kinder an e-mail concerning shipping procedure The e-mail contained a "check-list" which outlined a number of requirements and documents needed for successful importation.[2] Joyce Kinder asserts that she used this e-mail, along with information from her two prior experiences shipping caviar to foreign countries, to prepare the shipment. In February 2009, Kinder shipped the caviar from Louisville, Kentucky, bound for Heathrow Airport in London, England.

When the shipment arrived in the United Kingdom, it was stopped by customs officials at its point of entry in London. On February 20, 2009, the officials, from the United Kingdom

---

2   The parties dispute the proper inference to be drawn from this e-mail: each arguing that it shows the other bore responsibility for the shipment meeting regulations. However, the e-mail and its contents are not disputed.

Environment and Consumer Protection Port Health Division in the London Borough of Hillingdon ("Hillingdon"), sent a letter to Isenbourg's import agent, DHL Global Forwarding. In the letter, Hillingdon explained that the shipment was refused entry for two reasons: (1) the identification mark on the boxes did not "indicate the approval number of the establishment of origin, as required by Article 5 (and detailed in Annex II, Section I) of Regulation (EC) No 853/2004[;]" and (2) the health certificate was on two sheets of paper, rather than on a single sheet as required. The letter provided information on appealing the decision and further ordered that the caviar be shipped out of the EU within 60 days or it would be destroyed.

Isenbourg notified Kinder of the customs problem. It recommended that the caviar be shipped back to Kinder to be re-labeled in a compliant manner, but Kinder attempted to avoid the time and expense accompanying re-importation. Kinder enlisted the assistance of a number of officials and experts. Kinder was eventually able to cure the health certificate issue, but not the labeling issue. Kinder prepared new labels and sent them to Hillingdon, but they were not accepted. Until this point, the caviar had remained in the possession of United Kingdom customs agents.

On April 4, 2009, Isenbourg directed DHL to return the caviar back to Kinder. Kinder arranged to receive the shipment, the caviar arrived back in the United States, and Kinder took possession. Kinder claims that certain original documents were not returned with the caviar, so Kinder was unable to apply for re-export permits for a number of weeks. Kinder also asserts that the caviar was damaged when it was returned. According to Kinder, the condition of the boxes and packing materials inside each box and cooler suggested that the shipment had thawed and

then had been re-frozen. Kinder informed Isenbourg of the damage to caviar. Isenbourg had obtained insurance coverage on the shipment, so Kinder filed an insurance claim with the cargo carrier, United Airlines. Because United has not paid that claim, Kinder has joined them as a third-party defendant in this suit.

Kinder maintains possession of the caviar. Kinder considers the caviar to "belong" to Isenbourg, but Isenbourg has informed Kinder that it no longer wishes to receive the caviar. Isenbourg claims that it was forced to purchase replacement caviar from other vendors to meet its contractual obligations. The cost of the replacement caviar was significantly higher than the original purchase price (220,025 Euros).

The final conflict between the parties concerns an alleged agreement for Kinder to purchase caviar tins from Isenbourg (the "Caviar Tin Agreement"). According to Isenbourg, Kinder agreed to purchase 1,300 empty caviar tins from it for the purchase price of 1,476 Euros. Isenbourg has produced an invoice which it claims memorialized this agreement, but Kinder denies ever having seen the invoice. Kinder asserts that the two parties agreed that Kinder would distribute the tins on Isenbourg's behalf, rather than purchase the tins outright. On February 13, 2009, Isenbourg informed Kinder that it had shipped the caviar tins to the United States. Kinder is in possession of the caviar tins, but has not returned any payment to Isenbourg.

**II.     Analysis**

**1.     Summary Judgment Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In other words, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The moving party initially bears the burden of informing the court of the basis for its motion. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Celotex*, 477 U.S. at 323). The movant does so by bringing forward the relevant portions of the record which establish the absence of a genuine issue of material fact. *Id.* Once the movant has satisfied its burden, the nonmoving party must go beyond the pleadings and produce specific evidence to demonstrate that there is a genuine issue of material fact. *Id.* The nonmoving party must do more than cast some "metaphysical doubt" on the material facts. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). It must present significant, probative evidence of a genuine issue in order to defeat the motion for summary judgment. *Id.* In reviewing the motion, the Court must view all facts and inferences in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 586–87.

### 2. Choice of Law

The interpretation and construction of a contract is a matter of law. *Detroit Rdaint Prods. Co. v. BSH Home Appliances Corp.*, 473 F.3d 623, 627 (6th Cir. 2007). Because the events in this case transpired between the United Kingdom and the United States, the threshold question

is what law governs the alleged contract. As a federal court sitting in diversity, this Court applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Kentucky has consistently applied § 188 of the Restatement (Second) of Conflict of Laws to resolve choice of law issues that arise in contract disputes. *See Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). Section 188(1) states that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties." Restatement (Second) Conflict of Laws § 188(1) (1971). Therefore, this Court applied the "most significant contacts" test to determine which law applies. *See Breeding v. Massachusetts Indemnity and Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982) (holding that in disputes involving the "validity of a contract . . . [t]he modern test is which state has the most significant relationship to the transaction and the parties"); *Bonnlander v. Leader Nat. Ins. Co.*, 949 S.W.2d 618, 620 (Ky. App. 1996) (explaining that in contract actions, "the law of the state with the greatest interest in the outcome of the litigations should be applied").

The parties agree that Kentucky has the most significant relationship with the transaction in question and that Kentucky law should apply. [Record No. 59, p. 2 n.1 ("Kentucky contract law would apply to the Caviar Agreement, and this case in general.")] Kentucky has adopted Article Two of the Uniform Commercial Code ("UCC") to govern contracts for the sale of goods. Ky. Rev. Stat. Ann. ("KRS") § 355.2; *see A & A Mech. v. Thermal Equip. Sales*, 998 S.W.2d 505, 509 (Ky. App. 1999). However, despite indicating that Kentucky contract law applies, Isenbourg argues that the UCC should not apply. [Record No. 59, p. 2 n.1 ("Plaintiff

and Defendant are citizens of different countries. The UCC has no applicability with regard to foreign citizens.") The Court finds that this contention is without merit.[3] The UCC has been adopted in Kentucky with respect to the sale of goods such as those in issue in this case. Therefore, since the choice of law rules dictate that Kentucky law should apply, the UCC governs the contract at issue.[4]

### 3. Breach of Caviar Purchase Contract

The contract in this case is very simple. It includes a price term, a quantity term, short instructions on payment and timing, and the following language: "<u>SHIP TO</u>: Princesse d'Isenbourg et Cie Limited, 2 Bard Road, London, W10 6TP." Thus, the ultimate question before the Court is which party bore the responsibility for delivery of the caviar and ensuring that the shipment met UK Customs and CITES requirements? The answer is the seller: Kinder Caviar.

---

3     The Court recognizes that contracts for the sale of goods between citizens of different countries are, in *some* cases, governed by the Convention for the International Sale of Goods ("CISG") rather than the UCC. Typically, when a contract is signed between two international parties and one of the parties is a resident of a country that is a signatory to the CISG (a "Contracting State"), the contract is governed by the CISG. *See* CISG art. 1(1)(b). However, when it ratified the CISG, the United States declared a reservation that its courts would not be bound by Article 1(1)(b). Ralph H. Folsom, 1 International Business Transactions § 1.4 (3d ed.). In United States courts, the CISG is not applicable "when a contract is between parties having places of business in different States and only one State is a Contracting State." *Id.* While the United States is a Contracting State, the United Kingdom is not. *See id.* "Thus, a contract of sale between a United States party and another party in N, a non-Contracting State [such as the United Kingdom], will not be governed by CISG, even though United States law is applicable under usual choice-of-law rules." *Id.* "Instead of CISG, United States law for domestic sales transactions would govern, which means the Uniform Commercial Code (UCC) is applicable in forty-nine states." *Id.*

4     Because one of the purposes of the UCC is "to make uniform the law among the various jurisdictions," non-Kentucky cases which interpret parallel UCC provisions are also persuasive. *Star Bank v. Parnell*, 992 S.W.2d 189, 192 (Ky. App. 1998).

The UCC describes the general obligations of the parties in § 2-301: "The obligation of the seller is to transfer *and deliver* and that of the buyer is to accept and pay in accordance with the contract." KRS § 355.2-301 (emphasis added). Thus, absent a contrary provision, delivery is the seller's responsibility. The Invoice contained no provisions concerning the matter, so delivery is Kinder's responsibility. Therefore, the question this Court must answer is whether Kinder satisfied its obligation to deliver.

The UCC defines delivery obligations in two types of contracts: shipment contracts and destination contracts. *See Permalum Window & Awning Mfg. Co. v. Permalum Window Mfg. Corp.*, 412 S.W.2d 863, 867 (Ky. App. 1967). Under destination contracts, delivery is complete when the goods reach a particular, identified destination such as the buyer's place of business. *See id.* Shipment contracts, however, only require the seller to "put the goods in the possession of such a carrier and make such a contract for their transportation as may be reasonable having regard to the nature of the goods and other circumstance of the case." KRS § 355.2-504(a). Whether the contract is a shipment or destination contract can be important in determining both the seller's delivery obligation, *see id.*, and when the risk of loss passes from seller to buyer. *See* KRS § 355.2-509.

The only provision in the Invoice concerning delivery is the following language: "<u>SHIP TO</u>: Princesse d'Isenbourg et Cie Limited, 2 Bard Road, London, W10 6TP." Kinder argues that the contract language is ambiguous concerning delivery responsibility and, therefore, summary judgment is inappropriate. Isenbourg, on the other hand, contends that "the Caviar Agreement Invoice, drafted by Kinder, including this particular provision, clearly indicates that the caviar

was to be shipped to Isenbourg at its place of business." [Record No. 59, p. 2] In other words, Isenbourg argues that the invoice was a destination contract.[5] In reality, however, the Court need not decide whether the Invoice was a shipment or destination contract because Kinder breached its obligation under either designation.

If, as Isenbourg argues, the Caviar Agreement was a destination contract, Kinder would have had the duty to ensure that the goods reached the particular location of delivery — Isenbourg's place of business — in a manner that enabled the buyer to take possession. KRS § 355.2-503(1), (3). There is no dispute that the goods never reached Isenbourg's place of business. The caviar never physically reached "2 Bard Road, London, W10 6TP" nor did it even reach the United Kingdom in a manner that would have allowed Isenbourg to accept it — a United Kingdom corporation cannot take possession of an import that does not pass customs.

Conversely, if the Court interpreted the Caviar Agreement as a shipment contract, Kinder still failed to meet its obligation. Section 2-504 of the UCC defines the seller's obligation in shipping contracts. Unless otherwise agreed, the seller must

> (a) put the goods in the possession of such a carrier and make such a contract for their transportation as may be reasonable having regard to the nature of the goods and other circumstances of the case; and
>
> (b) obtain and promptly deliver or tender in due form *any document necessary to enable the buyer to obtain possession of the goods* or otherwise required by the agreement or by usage of trade; and
>
> (c) promptly notify the buyer of the shipment.

---

5   Contrary to Isenbourg's assertion, other courts have explained that "ship to" addresses "have no significance in determining whether a contract is a shipment or destination contract." *Electric Regulator Corp. v. Sterling Extruder Corp.*, 280 F. Supp. 550, 557–58 (D. Conn. 1968).

KRS § 355.2-504 (emphasis added). Comment 3 to this section explains:

> In the absence of agreement, the provision of this Article on options and co-operation respecting performance gives the seller the choice of any reasonable carrier, routing and other arrangements. Whether or not the shipment is at the buyer's expense *the seller must see to any arrangements, reasonable in the circumstances,* such as refrigeration, watering of livestock, protection against cold, the sending along of any necessary help, selection of specialized cars and the like for paragraph (a) is intended to cover all necessary arrangements whether made by contract with the carrier or otherwise.

*Id.* (emphasis added). Under this section, the seller bears responsibility for shipping *arrangements*. *See id.* While the actual shipment is done by carrier, the seller must provide all necessary documents and provide for other needs such as refrigeration or sending along additional assistance. *See id.* Essentially, when the seller provides the goods to the carrier, it must be properly arranged so as to be able to reach their final destination.

When Kinder provided the caviar to the carrier, it was not in a condition that would allow it to reach Isenbourg. The customs paperwork was not in proper order. Customs paperwork falls within "any document necessary to enable the buyer to obtain possession." *Id.* Had the proper documents been included and the proper labels attached, the goods would have reached Isenbourg. As previously stated, the seller bears the responsibility to provide the necessary documents and make the proper arrangements for the shipment to reach its destination. *See* KRS § 355.2-504. And Kinder did not do so in this case. Consequently, even if the Caviar Purchase Agreement is construed as a shipment contract, Kinder breached the agreement by not making adequate arrangements for the carrier to successfully deliver the goods. Therefore, any dispute whether the Caviar Agreement was a shipment or destination contract is immaterial, because in either instance Kinder failed to meet its delivery obligation.

This holding is also supported by simple logic. At all times prior to shipping, Kinder maintained possession of the caviar. Kinder made all the arrangements for shipping and contracted with the common carrier. Kinder presumably labeled the packages and provided all the import and customs documents to the carrier. It would not be logical to place the burden of those arrangements – or ensuring the proper completion of those arrangements – on the trans-Atlantic buyer who never touched the shipment. In summary, Kinder failed to meet its delivery obligation under the contract. Kinder breached an essential term of the contract and, therefore, is liable to Isenbourg for the resulting damages.

When a seller fails to deliver under a contract for the sale of goods, UCC § 2-713 provides the measure of damages: the difference between the market price at the time when the buyer learned of the breach and the contract price, plus any incidental and consequential damages, but less the expenses saved in consequence of the breach. KRS § 355.2-713. Additionally, when the buyer has already paid for the goods, the buyer may also recover "so much of the price as has been paid." KRS § 355.2-711(1). Isenbourg has established the price paid, $129,438.00, but has not provided proof of the market price at the time of breach, *see* KRS § 355.2-723, or other incidental or consequential damages. Therefore, the Court will grant summary judgment to Isenbourg on Count 1 of the Complaint — breach of the Caviar Purchase Agreement — but it cannot award damages based on the current state of the record.

### 4. Caviar Tin Agreement

The next concerns whether Kinder also breached the Caviar Tin Agreement. Isenbourg claims that the companies made an agreement, that Isenbourg shipped the tins to Kinder, and that

Kinder has not paid pursuant to the parties' agreement. Isenbourg produced an invoice it claims memorialized this agreement. However, Kinder claims that the two companies reached an entirely different agreement regarding the tins and that it never received the invoice Isenbourg produced. In essence, the parties dispute both the terms of the agreement and whether the contract, as memorialized by the invoice, ever existed. Thus, there are disputes regarding issues of both formation and interpretation.

Contract formation is a question of fact. *See McMurty v. Botts*, No. 1:04-81, 2006 U.S. Dist. LEXIS 54402, at *12 (W.D. Ky. ) (distinguishing scope of employment from formation of a contract, the latter of which would be a question of fact); *Ankle & Foot Care Ctrs. v. Infocure Sys.*, 164 F. Supp. 2d 953, 958 (N.D. Ohio 2001) ("Whether or not a contract exists is a question of fact."). In this case, the parties present different versions of the facts supporting formation.

An oral contract can be memorialized by sending a confirmatory memo. *See* KRS § 355.2-201. Consequently, Isenbourg points to the Caviar Tin Invoice as confirmation of what the oral agreement contained. However, a confirmatory memo will only bind the parties if it "is received and the party receiving it has reason to know of its contents." *Id.* Kinder has established a genuine issue of material fact regarding whether the Caviar Tin Agreement was ever received. As a result, the Court cannot accept its contents as evidence of an oral agreement. Isenbourg has failed to show that there is "no genuine dispute" as to the existence of a contract for sale of caviar tins. Fed. R. Civ. P. 56. Therefore, the Court will deny summary judgment on Count 2.

### 5. Unjust Enrichment

In Count 3, Isenbourg asserted alternative claims for unjust enrichment "arising out of both the Caviar [Purchase] Agreement and the Caviar Tin Agreement." These claims are based on the same subject matter as Isenbourg's breach-of-contract claims. Therefore, Isenbourg's unjust enrichment claim relating to the Caviar Purchase Agreement must fail as a matter of law. "Under Kentucky law, '[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract.'" *Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006) (quoting *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977)) (citing *Johnson Controls, Inc. v. Jay Indus.*, 459 F.3d 717 (6th Cir. 2006) (affirming the district court's conclusion that under Michigan law, an unjust enrichment claim is impermissible when express contract found)). Because the Court has found an express contract memorializing this agreement, Isenbourg cannot maintain an unjust enrichment claim.

The Court can, however, consider Isenbourg's unjust enrichment claim as to the caviar tins. Unjust enrichment requires proof of three elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. App. 2009) (citing *Guarantee Electric Co. v. Big Rivers Electric Corp.*, 669 F. Supp. 1371, 1380–81 (W.D. Ky. 1987)). In this case, Isenbourg has failed to provide any proof concerning the second element: a resulting appreciation of benefit by Kinder. According to Kinder, the tins are in Kinder's warehouse, ready to be distributed on Isenbourg's behalf. [*See* Record No. 53, p. 7] There is no evidence that Kinder has sold caviar tins and failed to pay Isenbourg those

profits. Because Isenbourg has failed to provide evidence sufficient to make a prima facie case, summary judgment will be denied on this claim.

### III. Conclusion

With respect to the Caviar Purchase Agreement, Kinder failed to meet its delivery obligations. Kinder breached the Caviar Purchase Agreement by failing to deliver or ship the goods in a proper manner. While the Court will grant summary judgment on Count 1 of Isenbourg's Complaint and hold Kinder liable under the Caviar Purchase Agreement, Isenbourg still must prove the amount of damages resulting from the breach. Additionally, factual disputes exist concerning the formation and substance of the Caviar Tin Agreement. Therefore, summary judgment will be denied as to Count 2. Finally, summary judgment will be denied regarding Count 3, unjust enrichment. Accordingly, it is hereby

**ORDERED** that Plaintiff Princesse D'Isenbourg et Cie Ltd.'s Motion for Summary Judgment [Record no. 39] is **GRANTED** as to Kinder's liability on Count 1 of the Complaint, but denied regarding damages under this count. The motion for summary judgment is **DENIED** as to Counts 2 and 3.

This 22nd day of February, 2011.



Signed By:
*Danny C. Reeves* DCR
United States District Judge